MARK G. HENNESS, ESQ.
Nevada Bar No. 5842
JOHN C. FUNK, ESQ.
Nevada Bar No. 9255
HENNESS & HAIGHT
8972 Spanish Ridge Avenue
Las Vegas, Nevada 89148
(702) 862-8200
*Attorney for Plaintiff*

JASON P. WILLIAMS, ESQ.
Nevada Bar No. 10275
G&P/SCHICK
3170 Fourth Ave., Third Floor
San Diego, California 92103
(619) 718-9790
*Attorneys for American Home Assurance Company*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBERT M. ACEVES,<br><br>                   Plaintiff,<br><br>vs.<br><br>EFCO CORP., an Iowa Corporation;<br>CONSTRUCTION PRODUCTS, INC., an<br>Iowa Corporation; DOE DEFENDANTS 2-<br>10, inclusive,<br><br>                   Defendants. | **Case No.: 2:10-cv-00421-ECR-PAL**<br><br><br><br><br><br>Consolidated with: |
| AMERICAN HOME ASSURANCE<br>COMPANY,<br><br>                   Plaintiff,<br><br>vs.<br><br>EFCO CORP., an Iowa Coporation;<br>CONSTRUCTION PRODUCTS, INC., an<br>Iowa Corporation; and DOES 2 through 50,<br>inclusive,<br><br>                   Defendants. | Case No.: 2-10-cv-02053-JCM-RJJ<br><br><br><br>**PLAINTIFFS ROBERT ACEVES AND<br>AMERICAN HOMES ASSURANCE<br>COMPANY'S JOINT DESIGNATION OF<br>EXPERT WITNESSES** |

COMES NOW Plaintiff, ROBERT M. ACEVES, by and through his counsel of record, MARK G. HENNESS, ESQ. and JOHN C. FUNK, ESQ. of the law firm of HENNESS & HAIGHT, and Plaintiff, AMERICAN HOME ASSURANCE COMPANY (AHA), by and through its counsel JASON P. WILLIAMS, ESQ. of the law firm of G&P/SCHICK, (herein jointly may be referred to as "Plaintiffs") hereby jointly disclose their expert witnesses in the above-entitled matter as follows:

1.      While the Nevada Revised Statutes and Rules of Civil Procedure do not require it, Plaintiffs, ROBERT ACEVES and AHA, designates the treating physicians in this case as expert witnesses insofar as they will provide opinion testimony regarding the cause, nature and extent of Plaintiff, ROBERT ACEVES's injuries, the reasonableness and necessity of his medical treatment, the reasonableness and customary nature of the cost of Plaintiff, ROBERT ACEVES's treatment, the likelihood Plaintiff, ROBERT ACEVES, will require future treatment, the cost of any said treatment, and the permanent disability Plaintiff, ROBERT ACEVES, has suffered and will suffer in the future as a result of his injuries sustained as a result of the subject-incident. Plaintiffs, ROBERT ACEVES and AHA, have previously disclosed the names of the treating doctors and their respective records and reports and incorporate said records herein by reference.

It is anticipated that the witness' testimony regarding the cause, nature, extent and permanency of Plaintiff, ROBERT ACEVES's injuries shall be based upon, among other things, his/her education, experience and knowledge as a medical practitioner licensed as such by the State of Nevada, his/her evaluation and treatment of the Plaintiff, ROBERT ACEVES, his/her review of all of Plaintiff, ROBERT ACEVES's medical records, both his/her own as well as those generated by other providers all of which pertain to Plaintiff, ROBERT ACEVES's care and treatment for the injuries Plaintiff, ROBERT ACEVES, sustained as a result of the subject

incident, his/her review of deposition transcripts in this case, his/her review of Plaintiff, ROBERT ACEVES's medical records generated prior to the subject incident and his/her review of medical treatises and articles commonly reviewed and relied upon by medical practitioners in this witness' field and which pertain to the specific issues in this case.

Plaintiffs further name the following individuals as expert witnesses:

2.      Theodore J. Koppenaal, Ph.D., PE
        Koppenaal & Associates
        8220 Cedar Mesa Avenue
        Las Vegas, Nevada  89149

Dr. Koppenaal is a Registered Professional Metallurgical Engineer and will provide expert testimony regarding his investigation, research, expert analysis and opinions pertaining to the subject concrete form system and its component parts as well as the applicable Standards of Care and safety procedures within the construction industry.

*See Dr. Koppenaal's initial report and curriculum vitae with fee schedule produced in Plaintiffs' Designation of Expert Witnesses filed on October 28, 2010, and incorporated herein by reference by the Plaintiffs.*  **See Dr. Koppenaal's Addendum Report attached hereto as Exhibit "1."**

3.      Terrance B. Dinneen, M.S., C.R.C., C.R.E.
        DeVinney & Dinneen
        Career & Vocational Economic Services, Ltd.
        445 Apple Street
        Suite 102
        Reno, Nevada 89502

Mr. Dinneen is expected to provide expert economic damages testimony regarding his investigation, research, expert analysis and opinions regarding the extent of the economic impact and damages the subject incident has had and will continue to have on Plaintiff, ROBERT ACEVES.

///

Mr. Dinneen will also testify as to the "time value" of money, also known as present day value of damages in relation to the economic impact this incident has caused and will cause Plaintiff, ROBERT ACEVES.

*See Mr. Dinneen's report and curriculum vitae with fee scheduled produced in Plaintiff ROBERT ACEVES' Designation of Expert Witnesses filed on October 28, 2010, and incorporated herein by reference.*

4.    Kris Parchuri, D.O.
      209 South 36th Street
      Muskogee, Oklahoma  74401

Dr. Parchuri is an Orthopaedic Surgeon. Dr. Parchuri will testify as to his examinations and treatment of the Plaintiff, ROBERT ACEVES, his review of the Plaintiff, ROBERT ACEVES's medical records the nature and cause of his injuries, the necessity of all of the treatment he received by this provider as well as all other providers, the reasonableness of the charges for all medical treatment incurred as a result of his injuries, and the likelihood he will require treatment in the future and/or suffer permanent injuries, all due to the subject incident.

**See Dr. Parchuri's Report and Curriculum Vitae including fee schedule attached hereto as Exhibits "2" and "3", respectively.**

Plaintiffs reserve the right to name any other witness as may be necessary for the purpose of rebuttal and/or impeachment.

Plaintiffs further reserve the right to name additional witnesses should they become known.

///

///

///

Plaintiffs also hereby supplement their answers to the applicable interrogatory responses dealing with expert witness disclosures.

DATED this 21st day of September, 2011.

HENNESS & HAIGHT                           LAW OFFICES OF GRAY & PROUTY


_  John C. Funk, Esq._____            _____Jason P. Williams, Esq._____
MARK G. HENNESS, ESQ.                      JASON P. WILLIAMS, ESQ.
Nevada Bar No. 5847                        Nevada Bar No. 10275
JOHN C. FUNK, ESQ.                         3170 Fourth Ave., Third Floor
Nevada Bar No. 9255                        San Diego, California 92103
8972 Spanish Ridge Avenue                  *Attorneys for American Home Assurance*
Las Vegas, Nevada  89148                   *Company*
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of September, 2011, I served a true and correct copy of the foregoing **PLAINTIFFS ROBERT ACEVES AND AMERICAN HOMES ASSURANCE COMPANY'S JOINT DESIGNATION OF EXPERT WITNESSES** via United Stated Mail, first class, postage prepaid to the following:

| | |
|---|---|
| James E. Whitmire, Esq. | David L. Charles |
| SANTORO, DRIGGS, WALCH, | CROWLEY FLECK PLLP |
| KEARNY, HOLLEY & THOMPSON | 666 Walnut Street, Suite 2000 |
| 400 South Fourth Street, 3rd Floor | Des Moines, Iowa  50309-3989 |
| Las Vegas, Nevada  89101 | *Attorneys for Defendant* |
| *Attorneys for Defendant* | |

_____/s/ Kelley Huff_____
An employee of Henness & Haight

*EXHIBIT "1"*

# ADDENDUM TO
# Failure Analysis of a
# Trolley Hanger Shoe Assembly

Submitted to

**Henness & Haight**
**8972 Spanish Ridge Avenue**
**Las Vegas, NV  89148**

Submitted by

**Koppenaal & Associates**
**8220 Cedar Mesa Avenue**
**Las Vegas, NV 89149**
**(702) 658-3443**
**tjkoppenal@aol.com**

September 20, 2011

KOPPENAAL & ASSOCIATES
Failure Analysis of a Trolley Hanger Shoe Assembly
September 20, 2011

# ADDENDUM TO
# Failure Analysis of a Trolley Hanger Shoe Assembly

## 1.0  INTRODUCTION

A previous report dated October 19, 2010, analyzed an accident that resulted from the partially collapsing of a form used for concrete pouring during the construction of the Cosmopolitan Resort Project in Las Vegas, Nevada, on September 16, 2008. The purpose of this Addendum is to provide additional information related to this accident. Only additions and/or changes to the original report are reported in this Addendum.

As with the original report, this Addendum analysis was conducted by Dr. T. J. Koppenaal of Koppenaal & Associates, Las Vegas, Nevada. Dr. Koppenaal's background includes a PhD in Metallurgy and Materials Science from Northwestern University, registration as a Professional Metallurgical Engineer, a Fellow of the American Society for Metals (now ASM International) and forty-nine years of experience performing metallurgical analyses and failures.

## 2.0  CONCLUSIONS

Section 2.4 of the original report has been replaced with the following:

2.4    EFCO had prior experience with failures of the same type of trolley shoe welds reported in this analysis. EFCO know this information as recent as one year prior to the subject accident. While EFCO approved a design to improve the trolley hanging shoe assemblies, it follows that EFCO did not institute procedures to insure properly welded trolley shoe assemblies.

KOPPENAAL & ASSOCIATES
Failure Analysis of a Trolley Hanger Shoe Assembly
September 20, 2011

## 3.0    DOCUMENTATION & OBSERVATIONS

Note that the section entitled "Aceves Deposition" in the original report should be Section 3.6 (and not 3.5). Sections 3.7, Deposition of EFCO Employee Randall Pauley, and 3.8, EFCO E-Mails, have been added in this addendum.

### 3.7    Deposition of EFCO Employee Randall Pauley

The deposition of Randall Pauley was taken on January 25, 2011. At that time Mr. Randall was the Engineering Manager for the Customer Solutions Group at EFCO (11:9). Except as noted, the statements made by Mr. Pauley relate to events that occurred _prior_ to the subject accident on September 16, 2008. Some of Mr. Pauley's statements include the following: _In 2007 there was reports that I got, and I received two trolley hangers, I believe it was. One of the projects I believe was Trump Tower with Perini Construction where the -- on the trolley hanger itself, the top shoe, it was found out in the field, did not have the right amount of weld that was supposed to be on it. So we replaced those trolley hangers. We had those shipped back over to Hawaii to replace those. Or not Hawaii. Sorry. To Las Vegas to the Trump Tower_ (33:5); _On the Trump Tower the ones I remember was they were missing a 5/16 weld underneath the angle that holds the angle to the main body of the trolley hanger shoe. They were only tack welded on, essentially_ (34:19); _On these few instances in Las Vegas_ [in 2007 related to the Trump Tower], _correct, it_ [the weld] _was missing. Some of the hangers were missing that weld_ (35:18); _The only ones_ [trolley hanger shoe assemblies with problem welds] _I'm aware of were at the Trump project originally, Vinoly, and Cosmo I saw a report where they saw one or two out at the job site that were missing weld_ (48:12) _Our_ [EFCO] _manufacturing facility_ [in Iowa] _– the welders weld everything_ [including the trolley shoes] _up over in our manufacturing facility_ (54:2).

In addition to these specific statements, Mr. Pauley testified that following the prior failures of the trolley hanger shoes (THS) at other projects, that EFCO did what they called a "retro fit" design where they added welds to the THS. This was agreed to and approved by EFCO. These "retro fit" designed THS were supposed to have been sent to projects. In the interim, EFCO did a "re-design" of the THS where they added "tabs" or "ears" to the THS along with additional welding. This design was also approved by EFCO. Both the "retro fit" and "re-design" were completed and approved prior to the Cosmopolitan project. This discussion runs through various locations in the deposition including 49:8, 51:1, 74:17, 74:20, 76:5, 77:16 and 77:22.

Mr. Pauley also comments on testing done at EFCO resulting in a weight rating of 7,500 lbs with a design and manufacturing threshold of 30,000 lbs resulting in the THS having a 4-1 safety factor for the THS (see Exhibit 45 to the Pauley deposition). These test results were obtained with properly welded THS, but considering the inadequate welds on the THS involved in the Aceves accident, the design rating of the THS are NOT applicable to the subject failed THS.

KOPPENAAL & ASSOCIATES
Failure Analysis of a Trolley Hanger Shoe Assembly
September 20, 2011

3.8     EFCO E-Mails

All of the following are taken from EFCO e-mails.

In an e-mail from Jim Johnson, Vice President Customer Relations, to Brian Bozman dated May 08, 2007, Mr. Johnson states, "Early on when we shipped the Trump Las-Vegas project we had problems with this part (trolley hanger shoe 60586) that the welds were breaking under less than design load. What was found that there was no weld or poor weld and that was why they were not supporting the load they were designed for. We may have found some on recent jobs we shipped to Las Vegas."

In an e-mail from Jim Johnson to Jeff Hartman and Randy Pauley dated May 09, 2007, Mr. Johnson states, "Take a look JJ. It looks like the weld from the gussets to the stock angle are the ones that broke. Looks like some sort of prying action was taking place."

In an e-mail from Jeff Hartman to Randy Pauley dated May 09, 2007, Mr. Hartman states, "These (the two photos he had available and that are attached to the e-mail) only show the side view, but looking at them, it looks like the weld between the angle iron and the gussets for the strut broke first and then the gussets peeled back causing the bending and tearing of the top side of the angle iron."

An e-mail from Randy Pauley to Tom Waldschmitt, Jim Johnson and Jeff Hartman dated May 09, 2007, reads in part, "I have been thinking about this hanger shoe and how it could be changed so that the weld is not quite as critical below the 1 ¾" hanger rod."

An e-mail from Andrew Gray to Randy Pauley and Kevin Eichmann dated May 09, 2007, reads, "FYI. Please find attached, a picture of the Power Tower hanger shoe that failed at the Vinoly jobsite." In an EFCO Field Service Fact Sheet that appears to been attached or part of this Vinoly jobsite e-mail, the following statements were made, "There was one more thing that we found concerning trolly hangers. There was a few found that were not welded they way they were supposed to be. I was asked to inspect all trolly hangers to make sure that they were welded properly."

In an e-mail from Randy Pauley to Jeff Hartman dated May 10, 2007, related to the Power Tower Trolley Hanger Shoe, Mr. Pauley states in part, "The one that was missing the weld on one side they found during an inspection of the trolley on site."

An e-mail from Paul Ford to Randy Pauley and Jeff Hartman dated May 10, 2007, states, "There was also one more located this morning at the Cosmo sight. It has been replaced and will be sent to DesMoines today. It is missing most of the welds holding the ears in place."

3

## 4.0   ANALYSIS & DISCUSSION

Add the following to the end of the second paragraph in this section:  Inherent in the product's design must be all foreseeable uses and Mr. Aceves' use was foreseeable. Thus, even if Mr. Aceves' use of the system contributed to the failure, such use was foreseeable, and the failure was a result of not properly manufacturing the product despite this foreseeable use.

In addition, the final paragraph in the original report that began, "There is an indication…" is deleted and replaced with the following two paragraphs.

The information in the Pauley deposition and the EFCO e-mails (Sections 3.7 and 3.8) provide definitive evidence that the EFCO trolley hanger shoe assemblies have had previous weld failures. As a result, not only is it evident that EFCO knew of the trolley shoe weld failure problem in advance, but they obviously did not institute procedures to insure properly welded trolley shoes. While their "retro-fit" design was approved before the Cosmopolitan Project, it is evident that the design was not followed in the manufacture of the subject trolley hanging shoe.

We interface with things every day, the safety and structural integrity of which relies of the correct application and execution of the welding process.  For instance, cars, airplanes and structures all can utilize welds, the failure of which can result in catastrophic consequences.  For instance, the seat in an automobile can have welds, the failure of which can cause the driver to lose control of the vehicle, resulting in serious injury to others.  Welds on heavy construction equipment can fail if not proper, resulting in injuries to workers and the public at large.  Improper welding of highway interchange components can and have led to catastrophic road way failure, resulting in numerous injuries and deaths.  These are just a few examples of how improper welding can lead to failure and injury.

T. J. Koppenaal, PhD, PE

4

*EXHIBIT "2"*

September 21, 2011


**HAND DELIVERED**
Mark G. Henness, Esq.
Henness & Haight, Injury Attorneys
8972 Spanish Ridge Avenue
Las Vegas, Nevada 89148

> **Re:** **Robert Aceves v. EFCO, et al.**
> **DOI: September 16, 2008**

## INITIAL REPORT

Dear Mr. Henness:

Your office recently retained me in this matter as an expert and asked that I perform a medical records review and summary regarding the care and treatment of Robert Aceves. As you know, I also was Robert Aceves treating physician and performed a lumbar fusion at L4-5 and L5-S1. This case involves a fall that resulted in injuries while Mr. Aceves was working at the Cosmopolitan construction site in Las Vegas, Nevada.

## DOCUMENTS REVIEWED

I reviewed the following medical records, documents and deposition testimony in preparing this report:

1. Medical records of Robert Aceves from Valley Orthopedics.
2. Prior medical records of Robert Aceves from Dr. Tung.
3. Prior medical records of Robert Aceves from Dr. Jacoby.
4. Worker's Compensation file for Robert Aceves.
5. Deposition of Dr. Tung.
6. Deposition of Robert Aceves.

## SUMMARY OF CASE AND OPINIONS

A brief summary of the facts of this case:

On a September 16, 2008 Robert Aceves was working at the Cosmopolitan Hotel and Casino construction site in Las Vegas, Nevada. According to his deposition, Mr. Aceves had a background in

1

concrete work. (deposition of Robert Aceves, pg 29, lines 4-9). At the time of the incident Mr. Aceves was standing on the plank on top of the perimeter wall form cycling concrete form work from floor to floor. Mr. Aceves was adjusting the turnbuckle to raise the form a little higher to roll the form away from the elevator core wall. When Mr. Aceves turned the turnbuckle with his pipe wrench he heard a loud pop and he fell on top of a form with his lower back (deposition of Robert Aceves, pg. 174, lns. 2-15).

A brief summary of the medical opinions in this case:

It is my opinion to a reasonable degree of medical probability that the fall at the Cosmopolitan more likely than not caused a disc injury at Mr. Aceves lumbar spine which resulted in increased back pain. It is also my opinion that the fall at the Cosmopolitan necessitated surgical intervention requiring a lumbar fusion at the L4-5 and L5-S1 levels. It is also my opinion that the care and treatment rendered to Mr. Aceves following the fall and subsequent injury was reasonable and the charges were customary.

## MEDICAL TREATMENT SUMMARY

March 18, 2008 – prior incident medical record. Mr. Aceves reports to Valley Pain Management With symptoms of chronic low back pain. Diagnosed with the following: Low Back Pain 724.2, Lumbar Strain 847.2, Lumbar DDD 722.52, Lumbar Radiculopathy 724.4, Lumbar HNP 722.10.

June 27, 2008 – Mr. Aceves receives epidural injections for low back pain that is radiating to his legs.

September 12, 2008 – Mr. Aceves returns to Valley Pain Management where he is seen for a follow up visit with improved leg pain by 45% and low back pain improvement for two weeks.

September 16, 2008 – Day of Incident. Mr. Aceves presented to Harmon Medical Center for his initial evaluation. He reported symptoms of lower back pain and discomfort. Radiographs of the lumbar spine revealed an L5-S1 disc abnormality and alteration in the lumbar lordotic curve which may be associated with muscle spasms. Mr. Aceves was diagnosed with "acute lumbar strain/contusion injury." He was given prescriptions to include ibuprofen, hydrocodone, and Amrix for his pain and he was scheduled for a follow-up visit.

September 29, 2008 - Mr. Aceves returned to Harmon Medical Center for a follow-up visit. He demonstrated decreased lumbar range of motion and sensitivity with extreme flexion and extension. The attending physician referred Mr. Aceves to obtain an MRI due to the ongoing nature and extent of his pain. Mr. Aceves presented to Insight Diagnostics to obtain a lumbar MRI on October 1, 2008. The study revealed:

1. Diffuse moderate lumbar disc degeneration accompanied by a number of disc herniations;
2. Associated edema in the upper L3 vertebra representing a more recent intervertebral disc herniation;
3. L5 nerve root encroachment in the foramen at L5-S1 and intermittent left L5 nerve root encroachment in the lateral spinal canal at L4-5; and
4. Paraspinous muscle spasm.

November 4, 2008 - Mr. Aceves was transferred to the care of Cesar Estela, MD, a board certified physiatrist and physical medicine and rehabilitation physician, for further pain management care. Mr. Aceves reported constant aching in his lower back with intermittent radiation to the left lower leg. Upon review of his most recent MRI, he noted some disc changes compared to prior studies. He related these disc changes to this incident. Dr. Estela recommended a referral to Dr. Joseph Schifini for epidural steroid injections and physical therapy following the injections. Mr. Aceves was given a refill on his prescription for Lortab and recommended he return in two weeks time.

January 14, 2009 – Mr. Aceves presented to Dr. Kris Parchuri at Valley Orthopedics. He reported stabbing back pain that shoots down his leg with tingling and numbness. Dr. Parchuri recommended that he obtain a discography to determine if Mr. Aceves had discogenic pain. If the discography was positive on one to two levels, Dr. Parchuri noted that he would proceed with a possible fusion.

January 23, 2009 - Mr. Aceves underwent a lumbar discography and lumbar CT scan with Dr. Jeffrey T. Bucholz and returned to see me (Kris Parchuri, D.O.) at Valley Orthopedics on January 28, 2009. The discography revealed discordant pain at levels L2-3 and L3-4 with an annular tear. The study also noted concordant pain at L4-5 and L5-S1. The CT Scan showed a disc protrusion with annular tear at L5-S1 and a disc bulge extending through an annular tear at L4-5. Based upon the discographic and radiographic findings, it was my medical opinion that Mr. Aceves was a candidate for two level disc fusion or one level fusion with disc replacement surgery. My recommendation was based upon the failure of conservative treatment in providing long-term relief to Mr. Aceves. My proposal was a fusion at L5-S1 and a disc replacement at L4-5.

February 27, 2009 - Mr. Aceves was referred back to Dr. Bucholz in which he reported severe pain in his lower back with radiating pain into his lower extremities. Dr. Bucholz prescribed Vicodin and Lyrica in an attempt to manage his pain. Over the following weeks, Mr. Aceves' symptoms increased with more frequent occurrences of pain. Dr. Bucholz ultimately recommended Mr. Aceves obtain an interlaminar lumbar epidural steroid injection with fluoroscopic guidance.

April 8, 2009 - Mr. Aceves completed the injection therapy as prescribed by Dr. Bucholz. After the procedure, he reported only one week of relief with a gradual return of his symptoms. Mr. Aceves had a follow-up examination with Dr. Bucholz following the injection. He noted an exacerbation of his symptoms and he rated the severity of his radiating leg pain the same as the back pain itself. Dr. Bucholz noted that he would benefit from a second set of epidural injections if it was approved by the Workers' Compensation case. Mr. Aceves reported that the level of his pain would hinder his completion of physical therapy exercises.

May 15, 2009 - Mr. Aceves was approved and underwent a second interlaminar lumbar epidural steroid injection with fluoroscopy. During the weeks that followed, he reported the return of his symptoms with greater frequency. Mr. Aceves noted entire low back pain with radiating pain and numbness into his buttocks, right leg, and right foot. On June 12, 2009, Dr. Bucholz re-examined Mr. Aceves after the second injection. Dr. Bucholz noted Mr. Aceves' would benefit from a surgical evaluation due to his unresolved symptoms after conservative therapy and the new discogenic pathology

3

as shown in the MRI. He refilled his prescriptions for Celebrex, Lyrica, and hydrocodone and Dr. Bucholz referred him back to myself for a surgical intervention evaluation.

———————June 18, 2009 – Mr. Aceves came to my office with his MRI that was taken in October 2008 and an MRI that was taken on in October 31, 2007, prior to his injury. He asked me to compare the two and I stated that I would. The one in 2007 showed that at L5-S1 on the T2 sagittal films there appeared to be some signs of right-sided foraminal stenosis that was secondary to a right paracentral disc herniation. At L4-L5 there were signs of degenerative disc disease and minimal evidence of stenosis at that point in time compared with the films from October 1, 2008, there did appear to be advancing degenerative changes within the vertebral bodies of L4 and L5. There was also evidence of neural encroachment at that level. At L5-S1 there was clear evidence of degeneration at the disc at this point in time with reactive changes at the L5 and S1 vertebral bodies. This was not evidently talked about or present in the MRI that was dated on October 31, 2007, so this would appear to be new following the incident.

August 13, 2009 - Mr. Aceves returned to my office for a surgical consultation. I discussed with Mr. Aceves the potential outcomes of undergoing surgery and that the goal was to improve his pain. I did advise him that eliminating his pain was unlikely. My recommendation was an anterior lumbar fusion at L4-L5 and L5-S1 with disc replacement. Due to Mr. Aceves' young age and his propensity to go back to heavy work, I recommended a hybrid construct.

Over the following months, Mr. Aceves returned to Dr. Bucholz periodically for prescription pain management. While he awaited approval of the surgery, he was instructed by Dr. Bucholz and his associates at The Pain Center to continue his home exercise program as tolerated. Once Mr. Aceves received approval for the procedures, he was a scheduled for a series of preoperative examinations before the surgery. Cardiopulmonary evaluations and diagnostic studies were completed and Mr. Aceves was ultimately cleared to proceed with surgery.

November 3, 2009 - Mr. Aceves presented to Surgical Specialty Hospital of Arizona as performed by myself where Mr. Aceves underwent the following procedures:

1. A radical anterior lumbar discectomy with removal of the posterior longitudinal ligament and bilateral foraminal decompression at L4-5 and L5-S1;
2. Anterior lumbar interbody fusion at L4-5 ad L5-S1 with anterior lumbar plate and screws;
3. Insertion of PEEK interbody spacers at L4-5 and L5-S1;
4. Use of BMP bone graft material at L4-5 and L5-S1;
5. Posterior spinal fusion of L4-5 and L5-S1; and
6. Fluoroscopy.

While in the procedure room, Mr. Aceves was placed supine on the operating table. His abdomen was prepped and draped in the usual sterile fashion. He was given perioperative antibiotics and the endotracheal tube was secured. An anterior lumbar approach to the lumbar spine was done. Once L4 and L5 were identified through x-ray and fluoroscopy, a radical discectomy was performed in a standard fashion decompressing both bilateral foramens as well as removing portions of the posterior longitudinal ligament. Peek interbody spacers were then placed with Infuse bone graft substitute material at L5-S1. Dr. Parchuri then bent an 84mm plate and secured it with 6 screws in a standard fashion. The wound was then irrigated with copious amounts of normal saline. The final x-rays

4

revealed good position of the plate and the wound was closed. Mr. Aceves was then placed prone for the second part of the procedure and his lumbar spine was prepped and draped in a sterile fashion. Two incisions were made on Mr. Aceves' left side corresponding to the L4-5 and L5-S1 facet joints. A standard instrumentation was then utilized to decorticate the facet joints at both levels. A 5mm allograft bone was placed in the facet joints to aid in fusion at the L4-5 and L5-S1 levels. When the procedure was complete, hemostasis was maintained and a sterile dressing was applied.

November 24, 2009 - Mr. Aceves returned to see me for a follow-up visit. His pain significantly improved since the surgery; however, he noted a different kind of pain in his lower back. Radiographs were ordered to review the positioning of the plate and screws and monitor for any changes. OxyContin and Vicodin were prescribed in an attempt to alleviate his pain. Mr. Aceves was advised to use his back brace and external bone growth stimulator at all times and return in one month for a follow up visit.

In the following weeks, Mr. Aceves returned to Dr. Bucholz for re-examinations after his surgery. Mr. Aceves noted that most of his pain is in the lower back and buttock region and his symptoms worsen with prolonged activities such as walking, standing, or turning. He also reported ongoing muscle spasms and tightness in his lumbar region. He continued with his prescription therapy with instructions to continue his follow-ups with Dr. Parchuri.

January 13, 2010 - Mr. Aceves began his conservative course of therapy at Physicians Physical Therapy. During his initial evaluation, he noted symptoms of centralized lower back pain that had been improving until two weeks prior. He reported that his improvement has plateaued. His examination revealed a stiff gait pattern with moderate tenderness and tightness with palpation to his lumbar spine. He demonstrated limited range of motion with pain and restricted body mechanics. His physical therapist, Daniel Selby, created a program to help condition and strengthen his abdominal and lower back muscles.

Following his initial examination, Mr. Aceves was generally sore after his first visits. His physical therapist increased resistance and repetitions in his exercise program to promote improved strength and stability in his lower back. Within a couple of weeks, Mr. Aceves was feeling stronger with less pain after his sessions.

February 26, 2010 - Mr. Aceves returned to see me for a follow-up visit. He reported that his improvement was slow but he felt better than he was prior to the lumbar surgery. He exhibited continued axial back pain with flexion and extension. An additional radiograph was obtained to monitor healing and positioning of the implants. I also advised Mr. Aceves that I would be leaving the facility and recommended another physician for further medical care.

April 2, 2010 – Mr. Aceves returned to Dr. Bucholz for a scheduled visit. Mr. Aceves had continued his conservative treatment and reported to Dr. Bucholz that he had complete resolution of his radicular pain since the surgery; however, he continued to suffer from low back axial pain. He demonstrated lumbar paraspinal hyptertrophy and tenderness to palpation. He also exhibited segmental lumbar restriction with range of motion testing. Mr. Aceves admitted to continued emotional distress over his levels of pain and functional limitations. Dr. Bucholz recommended continued physical therapy and the use of a TENS unit in between his physical therapy sessions. He was then referred to Dr. Peper for a behavioral therapy evaluation.

5

radicular pain since the surgery; however, he continued to suffer from low back axial pain. He demonstrated lumbar paraspinal hyptertrophy and tenderness to palpation. He also exhibited segmental lumbar restriction with range of motion testing. Mr. Aceves admitted to continued emotional distress over his levels of pain and functional limitations. Dr. Bucholz recommended continued physical therapy and the use of a TENS unit in between his physical therapy sessions. He was then referred to Dr. Peper for a behavioral therapy evaluation.

May 5, 2010 - Mr. Aceves had his initial consultation with orthopedic specialist Dr. Ali Araghi. During his physical examination he demonstrated discomfort with hyper extension of the trunk and had tenderness over the L4-5 regions. Upon review of the diagnostic studies, he noted that the L5-S1 appeared to be fused but was still uncertain with the L4-5 levels. He recommended a follow-up CT scan. He also noted that Mr. Aceves had adequate physical therapy and needed to convert to home exercise. Dr. Araghi requested he return in one month's time to review the CT scan.

July 7, 2010 - Mr. Aceves returned to Dr. Bucholz for a follow-up visit. Mr. Aceves noted that his symptoms were stable although he continued to experience ongoing lower back pain. He reported his level of lower back pain on most days is a "4" on a 0 to 10-pain scale. Despite his improvement, he noted that his pain can increase to a level "8" with prolonged activities such as standing or sitting for long periods of time. Dr. Bucholz continued to prescribe OxyContin, Robaxin and Hydrocone to help manage his ongoing pain and symptoms.

It is my initial preliminary opinion that Mr. Aceves has incurred over $227,000.00 in medical bills – including the surgeries outlined above. It is my opinion the medical bills incurred are reasonable and necessary and the charges are customary for the care and treatment given to Mr. Aceves.

It is also my initial preliminary opinion that although Mr. Aceves had prior back pain for which he sought treatment from Dr. Tung, Dr. Widemark and Dr. Suelzle that the September 16, 2008 incident at the Cosmopolitan caused additional pain and necessitated further medical treatment and ultimately a lumbar fusion. I reserve the right to modify my opinions subject to additional information or medical records.

*K. P.*

Kris Parchuri, D.O.

*EXHIBIT "3"*

**Kris Parchuri, D.O.**
*Fellowship Trained Spine Surgeon*
*Board Eligible Orthopedic Surgeon*
9101 South Toledo Avenue, Suite B • Tulsa, OK 74137
Phone: 539-664-4448 • E-mail: kparch@yahoo.com

## PROFESSIONAL EXPERIENCE

Orthopedic and Spine Center of Oklahoma, Tulsa, Oklahoma
- Private Practice (March 1, 2010 – Present)

Integrated Medical Services-Valley Orthopedics, Phoenix, Arizona
- Private Practice (September 15, 2008 – February 28, 2010)

## POST-GRADUATE TRAINING

Texas Back Institute, Plano, Texas
- Spine Surgery Fellowship (August 2007 – July 2008)

Oklahoma State University Medical Center, Tulsa, Oklahoma
- Orthopedic Surgery Residency (July 2002 – June 2007)

## EDUCATION

Kansas City University of Medicine and Biosciences, Kansas City, Missouri
- Degree:  D.O., June 2002

Austin College, Sherman, Texas
- Degree:  Bachelor of Arts, May 1996      Majors: Biology and Psychology

## PROFESSIONAL MEMBERSHIPS

- North American Spine Society, American Osteopathic Academy of Orthopedics, American Academy of Orthopedic Surgeons, American Osteopathic Association

## LICENSES/CERTIFICATIONS

- Oklahoma Medical License, #4109, issued in July 2003, renewable June 30, 2012
- Texas Medical License, M6328, issued April 2007, renewable August 31, 2012
- Arizona Medical License, #4737, issued Sept 2007, renewable December 31, 2011
- Florida Medical License, OS 11254, issued March 2011, renewable March 31, 2012
- Kansas Medical License, #05-33854, issued July 2009, inactive

## RESEARCH

- Parchuri, Zigler J. Range of Motion and Intervertebral Disc Height Following ProDisc-L  Total Disc Replacement, 2008.
- Parchuri, LaButti RS. Relationship between Pressurization Times and Cement Penetration in Cancellous Bone during Total Hip Arthroplasty, 2007.
- Parchuri, Do T. Displaced Medial Epicondyle Fractures in Children, 2006.
- Parchuri. Unicompartmental Knee Arthroplasty for the Treatment of Unicondylar Arthritis, 2003.

**ORTHOPEDIC & SPINE CENTER OF OKLAHOMA**
Kris Parchuri, D.O.
8803 S. 101st East Ave, Suite 255, Tulsa, OK 74133
Phone: (918) 249-0036  Fax: (918) 249-0074

Date:  09-21-2011

At your request, I am submitting my case history list.  I have since moved my practice from Arizona to Oklahoma and attempted to contact the Arizona office to obtain a copy of my case history.  My case history is relatively small.  I have had my deposition taken on four occasions and have given live testimony on one occasion.

If you should have any questions, please do not hesitate to contact my office at 918-682-7717.

Sincerely,


Kris Parchuri, D.O.

**ORTHOPEDIC & SPINE CENTER OF OKLAHOMA**
Kris Parchuri, D.O.
8803 S. 101st East Ave, Suite 255, Tulsa, OK 74133
Phone: (918) 249-0036  Fax: (918) 249-0074

Date:  12-20-2010

At your request, we scheduled **Kris Parchuri, D.O.** for a _____:

        **Regarding: Robert Aceves**
        **Date:**                             **Time:**
        **Place:  Las Vegas, NV**           **Total Due:**

This letter is to serve as confirmation of the above scheduled matter.  The following is a list of charges and cancellation policies for all medical-legal procedures.

| | |
|---|---|
| **CONFERENCE TIME:** | **$500.00 PER HOUR** |
| **DEPOSITIONS:** | **$1,000.00 PER HOUR** |
| **TRIAL TESTIMONIES:** | **$3,000.00 UP TO 4 HOURS** |
| | **$6,000.00 ALL DAY** |
| **ARBITRATION HEARINGS:** | **$3,000.00 UP TO 4 HOURS** |
| | **$6,000.00 ALL DAY** |
| **RECORD REVIEW:** | **$500.00 PER HOUR** |
| **NARRATIVE REPORT:** | **$500.00 PER HOUR** |
| **IMPAIRMENT QUESTIONAIRE:** | **$150.00 PER QUESTIONAIRE** |
| **IME-INDEPENDENT MEDICAL EVALUATION:** | **$1,500.00 PER APPOINTMENT** |
| **IME ADDITIONAL RECORDS REVIEW:** | **$500.00 PER HOUR** |
| **DISABILITY FORM COMPLETION:** | **$50.00 PER FORM** |
| **PHYSICAL CAPACITY EVALUATION FORM:** | **$50.00 PER FORM** |

**<u>TRAVEL EXPENSES ARE IN ADDITION TO THE ABOVE FEES, THEY ARE NOT INCLUSIVE.</u>**

It is our office policy that a **five working day cancellation notice**, from the scheduled time,  be given on all of the above.  If this notice is not received, **<u>THE FULL PRICE WILL BE CHARGED.</u>**

We also require that all fees be **<u>pre-paid</u>** five working days prior to the scheduled time.  If pre-payment is not received, the time may be canceled, and the cancellation fee may be charged.  **We also require that our physician receive NOTICE in writing for all Trials, Depositions, and Arbitrations.**

| | |
|---|---|
| **PLEASE MAKE CHECKS PAYABLE TO:** | **KRIS PARCHURI, D.O.** |
| **TAX IDENTIFICATION NUMBER:** | **27-1690815** |

If you should have any questions, please do not hesitate to contact my office at 918-249-0036.

Sincerely,


Kris Parchuri, D.O.